## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**MAONI YE** and **QIAN WU**, individually and on behalf of all others similarly situated

Plaintiffs,

v.

**NORDIC ENERGY SERVICES, LLC,**

Defendant.

**CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

## TABLE OF CONTENTS

PARTIES ............................................................................................................................. 3

JURISDICTION AND VENUE ........................................................................................... 3

    Subject Matter Jurisdiction ............................................................................................ 3

    Personal Jurisdiction ...................................................................................................... 3

    Venue .............................................................................................................................. 4

FACTUAL ALLEGATIONS ............................................................................................... 4

    A.    The History Of Deregulation And An ESCO's Role In Energy Markets. .......... 4

    B.    Nordic Exploits Its Customers. ............................................................................. 6

    C.    Plaintiffs Maoni Ye and Qian Wu's Dealings With Nordic Are Typical. .......... 8

    D.    Nordic Overcharged For The Variable Rate. ....................................................... 8

CLASS ACTION ALLEGATIONS .................................................................................... 12

CAUSES OF ACTION ....................................................................................................... 16

    COUNT I ....................................................................................................................... 16

    COUNT II ...................................................................................................................... 18

    COUNT III ..................................................................................................................... 22

    COUNT IV ..................................................................................................................... 24

PRAYER FOR RELIEF ..................................................................................................... 25

JURY DEMAND ................................................................................................................ 25

Plaintiffs Maoni Ye and Qian Wu, by their attorneys, Finkelstein, Blankinship, Frei-Pearson & Garber, LLP, Wittels McInturff Palikovic, and Carroll Shamberg LLC, bring this proposed class action in their individual capacities, and on behalf of a class of customers defined below, against Defendant Nordic Energy Services, LLC (hereinafter "Nordic" or "Defendant") and hereby allege the following with knowledge as to their own acts, and upon information and belief, as to all other acts:

1.     This action seeks to redress Nordic's deceptive bait-and-switch scheme that has caused tens of thousands of commercial and residential energy customers in the United States to pay considerably more for their electricity and natural gas than they should otherwise have paid.

2.     Nordic is an independent energy supply company ("ESCO") that competes with local utilities to supply electricity and natural gas in deregulated energy markets across the United States. Nordic is just a commodities broker. It buys energy on the wholesale market and resells it to customers at a markup, providing no additional value. It does not produce or deliver the energy it supplies to customers.

3.     To entice customers into buying its natural gas and electricity supply, Nordic offers customers a fixed supply rate for a few months, to be followed by a variable supply rate. At the beginning, that rate is fixed at a specific dollar amount per therm (for natural gas) or per kWh (for electricity). After the initial fixed term expires, Nordic promises that customers will pay a variable rate based on Nordic's "cost to acquire" the natural gas or electricity supply it sells to them, plus a markup of a set number of cents per therm or kWh.

4.     Nordic's offer to Plaintiffs was typical of the offer it made to other customers. Nordic offered to sell Plaintiffs natural gas at an introductory rate of 38.9 cents per therm for the initial two months, followed by a variable rate equal to Nordic's "cost to acquire a supply" plus 50 cents per therm.

1

5.      Any reasonable consumer, including Plaintiffs, would reasonably expect that the variable rate would thus be equal to Nordic's cost to acquire supply (plus 50 cents per therm) and that the "cost to acquire a supply" would only vary in accordance with Nordic's actual supply costs.

6.      However, such a reasonable consumer would be deceived by Nordic's promise to base the variable rate just on its costs to acquire the energy supply plus the fixed adder. In reality, Nordic's variable rates are substantially higher than its costs to acquire energy plus the specified fixed adder. Nordic is able to implement this deceptive scheme because ordinary consumers are not able to determine or ascertain Nordic's actual costs to acquire energy supply.

7.      As a result of Nordic's deceptive and misleading pricing promises, tens of thousands of customers have been, and continue to be, fleeced by Nordic out of tens of millions of dollars in exorbitant charges for electricity and natural gas. Defendant's scheme, which often affects society's most vulnerable citizens, is immoral, unethical, oppressive, and unscrupulous.

8.      Plaintiffs and other Nordic customers (the "Class") have been injured by Nordic's unlawful practices. Plaintiffs and the Class therefore seek damages, restitution, statutory penalties, and declaratory and injunctive relief for Nordic's violation of state consumer protection statutes and unjust enrichment.

9.      Only through a class action can Nordic's customers remedy its ongoing wrongdoing. Because the monetary damages suffered by each customer are small compared to the much higher cost a single customer would incur in trying to challenge Nordic's unlawful practices, it makes no financial sense for an individual customer to bring his or her own lawsuit. Further, many customers do not realize they are victims of Nordic's deceptive and unlawful conduct. With this class action, Plaintiffs and the Class seek to level the playing field and make sure that companies like Nordic do not prey on their customers.

2

## PARTIES

10.     Plaintiffs Maoni Ye and Qian Wu are spouses who reside in the same home in Bridgewater, New Jersey. Plaintiffs Maoni Ye and Qian Wu enrolled their home natural gas account with Nordic in or around late July 2024. Nordic charged Plaintiffs a fixed rate for their natural gas supply from in or around late July 2024 until in or around late September 2024, after which it began charging the variable rate. Plaintiffs cancelled their Nordic account in or around January 2025. Nordic charged Plaintiffs excessive and unauthorized rates for the variable rate natural gas every month. As a result of Nordic's unauthorized and unlawful conduct, Plaintiffs Maoni Ye and Qian Wu paid substantially more for their home natural gas supply than they otherwise should have paid.

11.     Defendant Nordic is an Illinois limited liability company with its principal place of business in Oakbrook, Illinois.

## JURISDICTION AND VENUE

*Subject Matter Jurisdiction*

12.     This Court has jurisdiction over the claims asserted in this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d), because the aggregate claims of the Class exceed the sum or value of $5,000,000, the Class has more than 100 members, and diversity of citizenship exists between at least one member of the Class and at least one Defendant.

*Personal Jurisdiction*

13.     This Court has general personal jurisdiction over Defendant because it is an Illinois limited liability company whose principal place of business is in Illinois, and it advertises, markets, distributes, and sells energy to Illinois customers.

3

*Venue*

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1), because venue is proper in "a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located." Defendant is a limited liability company that is deemed to reside in any judicial district in which it is subject to the court's personal jurisdiction. 28 U.S.C. § 1391(c)(2). Because Defendant is subject to this Court's personal jurisdiction, it resides in this District and venue therefore is proper in this District under § 1391(b)(1). Venue is also proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and conduct giving rise to Plaintiff's' claims occurred in Illinois; it is from Illinois that Defendant's deceptive marketing emanates; Defendant's decisions to overcharge Plaintiffs and the class were made in Illinois; and Defendant obtained its ill-gotten gains in Illinois.

## FACTUAL ALLEGATIONS

*A.     The History Of Deregulation And An ESCO's Role In Energy Markets.*

15.     In the 1990s and 2000s, numerous states deregulated their markets for retail energy. For example, in 1999, New Jersey's legislature and the New Jersey Board of Public Utilities ("NJBPU") deregulated New Jersey's market for electricity and natural gas. Among deregulation's goals were increased competition, with an eye towards achieving greater consumer choice and an overall reduction of energy rates. As a result, the State's electric and natural gas industries are open to competition, and consumers may choose their energy supplier. Deregulation laws in other states are substantially similar.

16.     Since New Jersey opened its retail natural gas markets to competition, numerous residential and small business customers have switched to an ESCO.

17.     ESCOs, the new energy suppliers, compete primarily against local utilities such as Public Service Electric and Gas Company ("PSE&G"). ESCOs purchase energy directly or

4

indirectly from companies that produce energy. ESCOs then sell that energy to end-user customers. However, ESCOs do not deliver energy to customers' homes and businesses, and many do not produce electricity or extract natural gas. Rather, the companies that produce energy deliver it to customers' utilities, which in turn deliver it to the customer. ESCOs merely buy electricity and natural gas and then sell that energy to end-users with a mark-up. Thus, ESCOs are essentially brokers and traders: they neither produce nor deliver electricity or natural gas, but merely buy energy from a producer and re-sell it to customers. The local utility also continues to bill the customer for both the energy supply and delivery costs. The only difference to the customer is whether the utility or an ESCO sets the price for the customer's energy supply. The only value that ESCOs add in the energy markets is their ability to reduce customers' costs compared to available alternatives like local utilities charge. Absent such savings, ESCOs merely siphon money from end users in the form of increased (and unnecessary) charges.

18.     ESCOs are subject to minimal regulation by state utility regulators like NJBPU. ESCOs like Nordic do not have to file or seek approval for the rates they charge or the methods by which they set their rates with the NJBPU.[1] Instead, an ESCO customer's rates are governed by the ESCO's agreement with its customer (and the relevant consumer protection laws).

19.     Customers who do not choose to switch to an ESCO for their energy supply continue to receive their supply from their local utility, such as PSE&G.

20.     The supply costs utilities like PSE&G and ESCOs like Nordic pay for natural gas are the same. Utilities and ESCO can purchase natural gas on the same open and competitive market.[2]

---

[1] *See generally,* Electric Discount and Energy Competition Act (EDECA), N.J.S.A. 48:3-49 et seq.
[2] In New Jersey, the NJBPU holds market-based auctions for utilities to purchase electricity and natural gas at wholesale on behalf of such customers; the utilities then charge these customers a

21.     Notably, PSE&G does not mark up the price it pays for securing the natural gas or electricity supply used by homes and businesses, and customers pay the same dollar-for-dollar cost PSE&G pays.[3]

22.     ESCOs like Nordic can purchase wholesale energy using the exact same wholesale market as utilities. ESCOs like Nordic can also pay the exact same prices. But ESCOs such as Nordic have even more options to acquire energy than the utilities, including: owning energy production facilities; purchasing energy from wholesale marketers and brokers at the price available at or near the time it is used by the retail consumer; and purchasing energy in advance, such as by purchasing futures contracts for the delivery of electricity and natural gas in the future at a predetermined price. The fundamental purpose of deregulation is to allow ESCO to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers.

**B.      *Nordic Exploits Its Customers.***

23.     Because of their increased flexibility, ESCOs like Nordic can offer rates competitive with—if not substantially lower than—the utilities' rates, and some do. Yet Nordic's variable rates are consistently and substantially higher than the local utility's rates and wholly detached from the energy acquisition costs to which Nordic promises to tie to its rates.

24.     Instead, Nordic's rates are the result of unbridled price gouging and profiteering.

---

rate based upon the market-based auction outcome. A third-party consultant on behalf of the NJBPU manages the auctions, and the bidding processes and results are made publicly available. As a result, these auctions reflect market prices.

[3] https://nj.pseg.com/newsroom/newsrelease334?utm ("The Basic Gas Supply Service (BGSS) rate reflects the actual cost utilities pay for natural gas, and utilities do not make any money on the supply charge."); (last visited July 10, 2025). https://nj.pseg.com/-/media/pseg/public-site/documents/paymentassistance/bgs-electric-rate-increase-21225.ashx?utm ("Utilities do not earn a profit on the electric supply; these costs are passed through directly to customers.") (last visited July 10, 2025).

25.     Nordic took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates. In theory, energy deregulation allows customers to shop around for the best energy rates, and it allows customers to take advantage of market-based rates that decline when wholesale costs decline. However, Nordic exploits deregulated markets by consistently charging its customers far more than its promised and fails to adequately disclose how its rates are actually determined. Customers like Plaintiffs do not have ready access to information regarding the market costs for energy supply, and thus Nordic can and does take advantage of this information asymmetry by charging excess rates, knowing that customers do not have ready access to data regarding Nordic's costs, nor the expertise to understand that data.

26.     In this case, Nordic knew that once it had acquired the consumer's energy account, it could charge high energy rates and many customers (if not most) would not know, and simply pay the exorbitant charges, month after month.

27.     It is well-established that defaults are powerful drivers of consumer behavior. There are various factors underlying this human tendency that have been discussed in the judgment and decision-making literature, such as the work about defaults, the "status quo bias,"[4] and "Nudges."[5]

28.     Nordic did not adequately disclose to Plaintiffs that its variable energy rates are consistently and significantly higher than the rates it promised it would charge.

29.     Nordic's omissions with respect to the rates it would charge were both material and deceptive.

---

[4] Daniel Kahneman, Jack L. Knetsch and Richard H. Thaler (1991), "Endowment Effect, Loss Aversion, and Status Quo Bias," The Journal of Economic Perspectives, Vol. 5, pp. 193–206.

[5] R. Thaler and S. Sunstein (2008), Nudge, Yale University Press.

**C.**    ***Plaintiffs Maoni Ye and Qian Wu's Dealings With Nordic Are Typical.***

30.    On Friday, May 23, 2024, a Nordic representative called Plaintiff Qian Wu to solicit Plaintiffs' enrollment for natural gas supply. Once Plaintiffs agreed, a third party agent of Nordic joined the phone call. On behalf of Nordic, that agent promised that if Plaintiffs enrolled with Nordic, "Nordic Energy will sell you gas at introductory rate of 38.9 cents per therm for the initial two months followed by a variable rate equal to Nordic Energy's cost to acquire a supply plus 50 cents per therm." The Nordic agent also promised that "[b]y agreeing to enroll with Nordic Energy, you will be automatically enrolled on no extra charges at Nordic Green program in which Nordic Energy will procure carbon offsets for 100% of your natural gas usage and includes renewable energy certificates to offset 100% of your electric usage."[6]

31.    Plaintiffs accepted Nordic's offer.

32.    Nordic began supplying natural gas to Plaintiffs residence and it continued to do so until they cancelled in or around January 2025. As detailed below, Nordic overcharged Plaintiffs every month they were a customer, in direct contravention of the promises Nordic made to Plaintiffs and other customers.

**D.**    ***Nordic Overcharged For The Variable Rate.***

33.    Plaintiffs of course do not have access to Nordic's actual costs. However, publicly available data regarding the market prices for natural gas in the same market and at the same time

---

[6] During that call, the Nordic agent also stated that "Nordic Energy will send you a confirmation letter with a contract summary and your contract terms and conditions which includes the full terms and conditions of the agreement that were summarized on this call." However, Plaintiffs do not recall receiving any such documents. Before filing this lawsuit, Plaintiffs requested a copy of their contract. They then received an email from a Nordic customer service email account with a copy of a recording of portions of the May 23, 2024 call and the statement that "I have attached a copy of your agreement with Nordic." The email did not attach a copy of you a confirmation letter, a contract summary, or any other contract terms and conditions.

as Nordic purchased natural gas for Plaintiffs demonstrates that Nordic's variable rate is not in fact based on its costs to acquire natural gas plus a 50 cent adder.

34.     Plaintiffs of course do not have access to Nordic's actual costs. However, publicly available data regarding the market prices for natural gas in the same market and at the same time as Nordic purchased natural gas for Plaintiffs demonstrates that Nordic's variable rate is not in fact based on its costs to acquire natural gas plus a 50 cent adder.

35.     The table below identifies (i) the variable rate Nordic charged Plaintiffs from September 2024 to January 2025 (when Nordic charged a variable rate), (ii) the corresponding market commodity price for natural gas based on the Natural Gas Citygate Price in New Jersey, plus 50 cents per therm, and (iii) the overcharge factor:

| Month | Nordic Variable Rate | Market Gas Supply Price[7] + 50 cents/Therm ($/Therm) | Nordic Overcharge Factor |
|---|---|---|---|
| Sept/Oct-24 | $1.12 | $1.00 | 1.1 |
| Oct/Nov-24 | $1.25 | $1.02 | 1.2 |
| Nov/Dec-24 | $1.35 | $1.05 | 1.3 |
| Dec/Jan-24/25 | $1.57 | $1.05 | 1.5 |

36.     The "city gate" is the point where natural gas is transferred from an interstate or intrastate pipeline to a local natural gas utility. The "city gate price" is the sales price of the natural gas at this point. ESCOs like Nordic can purchase natural gas at these prices, or they can use alternative purchasing strategies to obtain an even lower price.

37.     From September 2024 to January 2025, Nordic's variable rate increased by more than 40%. Yet at the same time, market prices for the same commodity (natural gas) in the same competitive and open wholesale market only increased by 5%. This further proves that Nordic's

---

[7] http://www.eia.gov/dnav/ng/hist/n3050nj3m.htm (last visited July 10, 2025)..

variable rate is not just based on its costs to acquire supply on the open and competitive market, but that instead Nordic overcharged Plaintiffs.

38.     That Nordic slowly and steadily increased the variable rate that Nordic charged (adding ten to thirteen cents per month) demonstrates that Nordic further engages in a deceptive, misleading, and unfair scheme known as glidepath pricing. Nordic knows that customers are more likely to notice sudden large increases in their bills rather than a bill that steadily increases. Accordingly, Nordic unfairly and deceptively puts new variable rate customers on a glide path to higher rates. Such glide paths have nothing to do with Nordic's promise to charge customers like Plaintiffs a variable rate that reflects Nordic's cost to acquire energy plus a fixed adder.

39.     Accordingly, the fact that the city gate price, even when adding 50 cents per therm, is almost always substantially lower than Nordic's variable rate shows that Nordic is charging a rate that is much higher than customers were promised.

40.     Moreover, publicly available data on the local utilities' rates, like PSE&G, which is the utility serving Plaintiffs' home, serves as an ideal indicator of whether Nordic's customers are actually being charged variable rates that are based on costs to acquire energy plus a specific markup. This is because the utilities' energy procurement costs are the same procurement costs ESCOs like Nordic incur and the utility's rate serves as a pure passthrough of those costs. Not only are local utilities Nordic's primary competitors (as utilities always are), but the utilities' supply costs reflect the actual cost to supply customers with energy. Consequently, local utilities' supply rates are an apt comparator for determining (at least at the pleading stage) whether the Nordic's variable rates are actually based on Nordic's energy acquisition costs.

41.     In fact, Nordic has a tactical advantage over the utilities as it can purchase energy from highly competitive markets for future use, and, therefore, its costs for purchasing energy should at the very least track (if not undercut) the utility's supply costs, albeit over a longer term.

Therefore, while Nordic's supply costs may not perfectly match the utilities' rates in any given month, they should be commensurate if not lower. Using the utilities' rates as a benchmark for Nordic's rates shows that Nordic's rates were driven by excessive mark-ups and profiteering.

42.     The following table compares the variable rate of Nordic's variable rates charged to Plaintiffs to PSE&G's corresponding commodity supply rates.

| Month | Nordic Variable Rate | PSE&G Gas Supply Price + 50 cents/Therm ($/Therm) | Nordic Overcharge Factor |
|---|---|---|---|
| Sept/Oct-24 | $1.12 | $0.83 | 1.3 |
| Oct/Nov-24 | $1.25 | $0.83 | 1.5 |
| Nov/Dec-24 | $1.35 | $0.83 | 1.6 |
| Dec/Jan-24/25 | $1.57 | $0.83 | 1.9 |

43.     This table demonstrates the drastic difference between Nordic's variable rates for Plaintiffs' account and PSE&G's corresponding commodity supply rates, even when accounting for the 50 cent per therm markup.[8]

44.     The local utility's rates are a reasonable, pre-discovery benchmark of a rate that is based on energy acquisition costs. As explained above, the local utility is Nordic's primary competitor in Plaintiffs' service territory, and the local utility's supply rate reflects the same commodity cost that ESCOs like Nordic incur in New Jersey. Thus, the utility's rate is an ideal benchmark for a rate that was calculated in accordance with the promise Nordic made to Plaintiffs.

45.     Nordic's promise to procure carbon offsets for 100% of natural gas usage also cannot explain this discrepancy. In fact, the cost to purchase carbon offsets for 100% of Plaintiffs' usage ranged from just 10 to 13 cents per therm.

---

[8] https://www.PSE&G.com/docs/librariesprovider11/rates-and-tariffs/gas-rates/2024-current/historical/historical-commodity-cost-of-gas.pdf?sfvrsn=6b8be751_9 (last visited July 10, 2025).

46. Moreover, Nordic promised that there would be "no extra charges" for the automatic enrollment in the Nordic Green program. And in any event, Nordic's cost to acquire natural gas supply does not include the cost for carbon offsets; that is a separate service or commodity. Therefore, to the extent that Nordic did in fact include the cost of carbon offsets as a "cost to acquire its supply," Nordic acted deceptively by misrepresenting that the variable rate would be based on the cost to acquire supply, when in fact Nordic's variable rates also include a separate charge for carbon offsets.

47. Nordic fails to inform its customers that it will charge more for the variable rate than its actual costs plus 50 cents per therm. No consumers would enroll with Nordic if they knew about this practice.

48. Nordic also fails to adequately disclose that its variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges. Similarly, Nordic fails to disclose that customers paying its variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates.

49. Nordic also fails to provide customers with adequate advance notice of the variable rates it would charge, or the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

50. Given that Defendant has engaged in a series of deceptive acts and omissions for which it billed consumers and consumers continued to pay, the continuing violation doctrine applies, effectively tolling the limitations period until the date of Nordic's last wrongful act against Plaintiffs, when Nordic last charged Plaintiffs substantially more for energy than it promised.

## **CLASS ACTION ALLEGATIONS**

51. Plaintiffs bring this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (3) of the Federal Rules of Civil Procedure, on behalf of a class of all residential and

commercial customers in the United States to whom Nordic promised to charge a variable rate based on, equal to, or reflective of Nordic's cost to acquire or procure the natural gas or electricity supply it will sell them, plus an adder, from the earliest allowable date through the date of judgment (the "Class").

52.     Plaintiffs also bring this action on his own behalf and additionally, pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a class of all New Jersey residential and commercial customers to whom Nordic promised to charge a variable rate based on, equal to, or reflective of Nordic's cost to acquire or procure the natural gas or electricity supply it will sell them, plus an adder, from the earliest allowable date through the date of judgment (the "New Jersey Subclass").

53.     As alleged throughout this Complaint, the Class claims all derive directly from a single course of conduct by Defendant. Defendant has engaged in uniform and standardized conduct toward the Class—deceiving customers as to the basis of its variable rate—and this case is about the responsibility of Defendant for its knowledge and conduct in deceiving its customers. Defendant's conduct did not meaningfully differentiate among individual Class members in its degree of care or candor, its actions or inactions, or in its omissions.

54.     Excluded from the Class are Defendant; any parent, subsidiary, or affiliate of Defendant; any entity in which Defendant has or had a controlling interest, or which Defendant otherwise control or controlled; and any officer, director, employee, legal representative, predecessor, successor, or assignee of Defendant.

55.     Plaintiffs reserve the right, as might be necessary or appropriate, to modify or amend the definition of the Class and/or add additional Subclasses, when Plaintiffs file their motion for class certification.

56. Plaintiffs do not know the exact size of the Class since such information is in the exclusive control of Nordic. Plaintiffs believe, however, that based on the publicly available data concerning Nordic's customers in the United States, the Class encompasses at least tens of thousands of individuals whose identities can be readily ascertained from Nordic's records. Accordingly, the members of the Class are so numerous that joinder of all such persons is impracticable.

57. The Class is ascertainable because its members can be readily identified using data and information kept by Nordic in the usual course of business and within its control. Plaintiffs anticipate providing appropriate notice to each Class Member in compliance with all applicable federal rules.

58. Plaintiffs are adequate class representatives. Their claims are typical of the claims of the Class and do not conflict with the interests of any other members of the Class. Plaintiffs and the other members of the Class were subject to the same or similar conduct engineered by the Defendant. Further, Plaintiffs and members of the Class sustained substantially the same injuries and damages arising out of Nordic's conduct.

59. Plaintiffs will fairly and adequately protect the interests of all Class Members. Plaintiffs have retained competent and experienced class action attorneys to represent his interests and those of the Class.

60. Questions of law and fact are common to the Class and predominate over any questions affecting only individual Class Members, and a class action will generate common answers to the questions below, which are apt to drive the resolution of this action:

      a. Whether Nordic's misrepresentations and omissions are material and have the capacity to deceive;

      b. Whether Nordic's conduct violates various state consumer protection and unfair competition statutes;

14

c. Whether Nordic was unjustly enriched as a result of its conduct; and

d. Whether, and to what extent, equitable relief should be imposed on Nordic to prevent it from continuing its unlawful practices.

61.     A class action is necessary because (i) the prosecution of separate actions by Class Members will create a risk of adjudications with respect to individual Class Members that will, as a practical matter, be dispositive of the interests of the other Class Members not parties to this action, or substantially impair or impede their ability to protect their interests; and (ii) the prosecution of separate actions by Class Members will create a risk of inconsistent or varying adjudications with respect to individual Class Members, which will establish incompatible standards for Defendant's conduct.

62.     A class action is appropriate because Defendant has acted or refused to act on grounds generally applicable to all Class Members.

63.     A class action is superior to all other available methods for resolving this controversy because questions of law and fact common to the Class predominate over any questions affecting only individual Class Members and a class action will fairly and efficiently adjudicate the controversy.

64.     Further, the following issues are also appropriately resolved on a class-wide basis under Federal Rule of Civil Procedure 23(c)(4):

a. Whether Nordic's misrepresentations and omissions are material and have the capacity to deceive;

b. Whether Nordic's conduct violates various state consumer protection and unfair competition statutes; and

c. Whether Nordic was unjustly enriched as a result of its conduct.

65.     Accordingly, this action satisfies the requirements set forth under Federal Rule of Civil Procedure 23(a), 23(b), and 23(c)(4).

## CAUSES OF ACTION

### COUNT I
### *Violation of the New Jersey Consumer Fraud Act*
### *(On Behalf Of Plaintiffs And The New Jersey Subclass)*

66.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

67.     The New Jersey Consumer Fraud Act prohibits, *inter alia*:

The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression, or omission, in connection with the sale or advertisement of any merchandise . . .

N.J.S.A. § 56:8-2.

68.     Defendant's material omissions with respect to the rates charged for electricity and/or natural gas, as described above, constitute actionable omissions in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act. Specifically, as detailed herein, Defendant made, and continues to make, the following material omissions, including:

   a. Failing to disclose that the variable rate is not based on Nordic's cost to acquire supply plus a specified adder.

   b. Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges.

   c. Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates.

   d. Failing to provide customers with adequate advance notice of the variable rates it would charge.

   e. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

69. The information Defendant concealed would have been material to any consumer deciding whether to purchase electricity and/or natural gas from Defendant.

70. Defendant also engaged in unlawful misrepresentations, including representing to potential customers that its variable rate will be based on its costs to acquire supply plus a fixed adder, when its variable rates are in fact much higher than its costs plus the specific adder.

71. Defendant's misrepresentations and false, deceptive, and misleading statements with respect to the rates charged for electricity and/or natural gas, as described above, constitute affirmative misrepresentations in connection with the marketing, advertising, promotion, and sale of electricity and/or natural gas in violation of the New Jersey Consumer Fraud Act.

72. Defendant's false, deceptive, and misleading statements would have been material to any potential consumer's decision to purchase electricity and/or natural gas from Defendant.

73. Defendant's misrepresentations and omissions were outside the norm of reasonable business practices, unconscionable, and constitute substantial aggravating circumstances under the New Jersey Consumer Fraud Act. Had Nordic not committed the misrepresentations and omissions detailed herein, Plaintiffs and New Jersey Subclass Members would not have agreed to accept Nordic's gas and electric services.

74. Defendant made these false, deceptive, and misleading statements and omissions with the intent that its customers rely upon such statements.

75. Plaintiffs and the other members of the New Jersey Subclass entered into agreements to purchase electricity and/or natural gas from Defendant and suffered ascertainable loss as a direct and proximate result of Defendant's actions in violation of the New Jersey Consumer Fraud Act.

17

76.     As a consequence of Defendant's wrongful actions, Plaintiffs and the other members of the New Jersey Subclass suffered an ascertainable monetary loss, including but not limited to the difference between the price Plaintiffs and Class Members paid and the price they would have paid had Defendant set the variable rate based on its costs to acquire energy supply plus the specified adder.

77.     Plaintiffs and other members of the New Jersey Subclass suffered an ascertainable loss caused by Defendant's misrepresentations and omissions because they would not have entered into an agreement to purchase electricity from Defendant if the true facts concerning its rates had been known.

78.     By reason of the foregoing, Defendant is liable to Plaintiffs and the other members of the New Jersey Subclass for trebled compensatory damages; punitive damages; attorneys' fees, and the costs of this suit. N.J.S.A. §§ 56:8-2.11, 8-2.12, 8-19.

79.     Defendant knows full well that it charges variable rates that are unconscionably high, and the misrepresentations and omissions it makes with regard to its rates were made to induce customers to purchase electricity from Nordic so it can reap outrageous profits to the direct detriment of its New Jersey customers and without regard to the consequences high utility bills cause such consumers. Defendant's conduct was intentional, wanton, willful, malicious, and in blatant disregard of, or grossly negligent and reckless with respect to the well-being of Plaintiffs and the other members of the Class. Defendant is therefore additionally liable for punitive damages, in an amount to be determined at trial.

## COUNT II
### Violation Of Materially Identical State Consumer Protection Statutes
### (On Behalf Of The Class)

80.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

18

81. Pursuant to the following materially identical consumer protection statutes of Delaware, the District of Columbia, Illinois, Indiana, Maryland, Massachusetts, Michigan, New York, Ohio, Pennsylvania, Rhode Island, and Virginia, consumers are protected against deceptive acts or practices, misrepresentations, or omissions which affect business, trade, or commerce.

82. Nordic violated at least the following materially identical statutes:

a. Delaware Trade Practices Act, 6 Del. C. § 2532*, et seq*;

b. District of Columbia Consumer Protection Procedures Act, D.C. Code § 28-3904, *et seq.;*

c. Indiana's Deceptive Consumer Sales Act, Ind. Code Ann. § 24-5-0.5, *et seq.*;

d. Illinois Consumer Fraud and Deceptive Trade Practices Act, 815 ILCS § 505/2;

e. Maryland Consumer Protection Act, Md. Commercial Law Code Ann. § 13-303, *et seq.*;

f. Mass. Gen. Laws. Ch. 93A;

g. Michigan Consumer Protection Act, M.C.L. § 445.903;

h. New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-2;

i. New York General Business Law § 349;

j. Ohio Deceptive Trade Practices Act, Ohio Rev. Code Ann. 4165.01, *et seq.*;

k. Pennsylvania Unfair Trade Practices and Consumer Protection Law, 73 P.S. § 201-2(4);

l. Rhode Island Unfair Trade Practice and Consumer Protection Act, R.I. Gen. Laws Section 6-13.1-11, *et seq.*; and

m. Virginia Consumer Protection Act. Va. Code Ann. § 59.1-196, *et seq.*

83. Plaintiffs bring this claim on their own behalf and on behalf of each member of the Class.

84. Nordic's marketing and sales practices are consumer-oriented in that they are directed at members of the consuming public.

85. Defendant intentionally deceived Plaintiffs and the Class by affirmatively misrepresenting that it would charge a rate based on its costs to acquire energy supply, plus an adder, knowing full well that it would charge a much higher rate. These affirmative misrepresentations constitute an unfair, abusive, or deceptive act or practice in connection with a consumer transaction.

86. Defendant also made unfair, false, deceptive, and misleading omissions with respect to its variable electricity and natural gas rates, which constitute an unfair, abusive, or deceptive omission, or practice in connection with a consumer transaction, including:

    f. Failing to disclose that the variable rate is not based on Nordic's cost to acquire supply plus a specified adder.

    g. Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges.

    h. Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates.

    i. Failing to provide customers with adequate advance notice of the variable rates it would charge.

    j. Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

87. Each of the omissions above constitute an unfair, abusive, or deceptive act or practice in connection with a consumer transaction.

88.     This omitted information would have been material to any potential customer, as was the false information Nordic affirmatively conveyed.

89.     The above unfair and deceptive practices and acts by Nordic were material omissions of existing or past facts.

90.     Nordic knew that the above unfair and deceptive practices and acts were material omissions. Nordic knew at the time it signed up Plaintiffs and prospective customers that the price of a customer's energy supply was a material factor in choosing Nordic.

91.     The aforementioned acts are continuing, unconscionable, and deceptive and are contrary to each state's public policy, which aims to protect consumers.

92.     Nordic's false, deceptive, and misleading statements and omissions would have been material to any potential consumer's decision to continue to purchase energy from Nordic.

93.     Nordic knew at the time it signed up Plaintiffs and prospective customers that a customer's primary alternative to Nordic was the customer's local utility.

94.     Nordic's intentional concealments and misrepresentations were designed to deceive current and prospective variable rate customers. By making the material omissions outlined above, Nordic deprived customers of the ability to make informed purchasing decisions.

95.     Nordic's practices are unconscionable and outside the norm of reasonable business practices.

96.     As a direct and proximate result of Nordic's unlawful deceptive acts and practices, Plaintiffs and Class Members remained with Nordic and suffered and continue to suffer an ascertainable loss of monies based on the difference in the prices and charges they were paid versus the prices and charges they would have paid had Nordic charged a rate based on its promise, as well as the difference in Nordic's variable rate and the default rate utilities charge, which is the rate Plaintiffs and Class Members would have received had the not been deceived into accepting

21

energy supply from Nordic. By reason of the foregoing, Nordic is liable to Plaintiffs and Class Members for trebled compensatory damages, attorneys' fees, and the costs of this suit.

97.     Plaintiffs and the members of the Class further seek equitable relief against Nordic. This Court has the power to award such relief, including but not limited to, an Order declaring Nordic's practices to be unlawful, an Order enjoining Nordic from engaging in any further unlawful conduct, and an Order directing Nordic to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

98.     As a result of Nordic's deceptive acts or practices, Plaintiffs and Class Members suffered actual damages in an amount to be determined at trial, and are entitled to their damages, statutory damages, costs, and reasonable attorneys' fees and all other relief available under each state's respective consumer protection statute.

**COUNT III**
***Violation of the EDECA and Retail Choice Consumer Protection Regulations***
***(On Behalf Of Plaintiffs And The New Jersey Subclass)***

99.     Plaintiffs reallege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

100.    Under N.J. Admin. Code § 14:4-7.3(d)(1) electric power and gas suppliers like Defendant are prohibited from making false or misleading advertising claims to a potential residential customer.

101.    Under N.J. Admin. Code § 14:4-7.4(n)(1) electric power and gas suppliers like Defendant are prohibited from making false or misleading marketing claims to a potential residential customer.

102.    N.J. Admin. Code § 14:4-7.13 provides a private right of action to residential customers who were subjected to false or misleading advertising or marketing by an electric power

or gas supplier in violation of either N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1).

103.     Defendant's material misrepresentations and omissions with respect to the rates charged for electricity and/or natural gas, as described above, constitute false and misleading advertising and marketing under N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1). Specifically, as detailed herein, Defendant made, and continues to make, the following material misrepresentations and omissions, including:

k.   Failing to disclose that its variable rates are not based on its costs to acquire energy plus an adder.

l.   Failing to adequately disclose that Defendant's variable energy rates are consistently and significantly higher than the rates the customer's existing utility charges;

m.   Failing to adequately disclose that customers paying Defendant's variable energy rates receive no material added benefit in exchange for paying energy rates that are dramatically higher than the local utility's rates;

n.   Failing to provide customers with adequate advance notice of the variable rates it would charge;

o.   Failing to adequately disclose the variable rate methodology Nordic used to calculate its variable rates to enable customers to potentially compare prices; and

p.   Failing to adequately disclose the conditions that must be present for a variable rate customer to save money compared to what the consumer's local utility would have charged.

104.     Plaintiffs and all New Jersey Subclass Members were subjected to Defendant's false and misleading advertising and marketing under N.J. Admin. Code § 14:4-7.3(d)(1) or N.J. Admin. Code § 14:4-7.4(n)(1).

105.     Defendant collected charges for electric generation service and/or gas supply service from Plaintiffs and all New Jersey Subclass Members.

106. By reason of the foregoing, Defendant is liable to Plaintiffs and New Jersey Subclass Members for an amount equal to all charges paid by these customers to Nordic after such violations occurred.

107. By reason of the foregoing, Defendant is also liable to Plaintiffs and New Jersey Subclass Members for a civil penalty pursuant to N.J.S.A. 48:3-83.

108. Plaintiffs and the members of the New Jersey Subclass further seek equitable relief against Defendant. This Court has the power to award such relief, including but not limited to, an order declaring Defendant's practices to be unlawful, an order enjoining Defendant from engaging in any further unlawful conduct, and an order directing Defendant to return to the Plaintiffs and the Class all amounts wrongfully assessed and/or collected.

109. As a result of Defendant's false and misleading advertising and marketing, Plaintiffs and New Jersey Subclass are also entitled to their damages, costs, and reasonable attorneys' fees and all other relief available.

### COUNT IV
### *Unjust Enrichment*
### *(On Behalf Of The Class)*

110. Plaintiffs re-allege and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

111. Plaintiffs and the Class Members conferred a tangible economic benefit upon Nordic by paying Nordic for electricity or natural gas. Plaintiffs and the Class would not have paid Nordic for electricity and/or natural gas had they known that Nordic would use the information asymmetry to charge rates substantially in excess of its supply acquisition costs, taking into account the set adder.

112. Plaintiffs and the Class Members would not have purchased energy from Nordic had they known the truth about Nordic's energy rates.

113. By engaging in the conduct described above, Nordic has unjustly enriched itself and received a benefit beyond what was contemplated by the parties at the expense of Plaintiffs and Class Members.

114. It would be unjust and inequitable for Nordic to retain the payments Plaintiffs and Class Members made for excessive energy rates.

115. Therefore, Nordic is liable to Plaintiffs and Class Members for the damages that they have suffered as a result of Nordic's actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that the Court:

a) Issue an order certifying the Class defined above, appointing the Plaintiffs as Class Representatives, and designating the undersigned firms as Class Counsel;

b) Render an award of compensatory and statutory damages, the precise amount of which is to be determined at trial;

c) Issue an injunction or other appropriate equitable relief requiring Defendant to refrain from engaging in the deceptive practices alleged herein;

d) Render an award of punitive damages;

e) Enter judgment including interest, costs, reasonable attorneys' fees, costs, and expenses; and

f) Grant all such other relief as the Court deems appropriate.

## JURY DEMAND

Under Federal Rule of Civil Procedure 38, Plaintiffs demand that a jury determine any issue triable of right.

Dated: July 11, 2025

*/s/ Katrina Carroll*
Katrina Carroll
**CARROLL SHAMBERG LLC**
111 West Washington Street Suite 1240
Chicago, IL 60602
Office: 872-215-6205
Mobile: 847-848-1384
katrina@csclassactions.com

**WITTELS MCINTURFF PALIKOVIC**
J. Burkett McInturff*
305 Broadway, 7th Floor
New York, New York 10007
Telephone: (914) 775-8862
nar@wittelslaw.com

**FINKELSTEIN, BLANKINSHIP,**
**FREI-PEARSON & GARBER, LLP**
D. Greg Blankinship*
One North Broadway, Suite 900
White Plains, New York 10601
Telephone: (914) 298-3290
gblankinship@fbfglaw.com

*Attorneys for Plaintiffs and the Proposed
Class*

*\*Pro Hac Vice application forthcoming*