**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**

| | | |
|---|---|---|
| QIAN WU, individually and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | No. 25 C 7890 |
| v. | ) ) | Judge Rebecca R. Pallmeyer |
| NORDIC ENERGY SERVICES, LLC, | ) ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Nordic Energy Services, LLC ("Nordic") is in the business of providing energy to retail customers who might otherwise purchase energy from a local utility. In May 2024, Plaintiff Qian Wu[1] received a call from a representative of Defendant Nordic, offering to provide her with natural gas at an attractive rate. The Nordic representative told Wu that after a set period of fixed pricing, her natural gas bill would include a variable rate equal to Nordic's cost of acquiring her natural gas supply, plus a fixed markup. During that call, Ms. Wu agreed to switch over her natural gas enrollment to Nordic. In this lawsuit, Ms. Wu alleges that Nordic violated New Jersey consumer protection law by unlawfully misrepresenting and omitting material terms, and committing regulatory violations. Wu claims that after the fixed rate period expired, Nordic persistently overcharged her for the variable rate.

Nordic contends that the parties' relationship is in fact governed by the terms of what Nordic calls a written "contract", containing terms that expressly permit Nordic to impose the challenged rates. Ms. Wu does not recall having received these written terms and conditions, and though Nordic attached copies of the document to its motions to dismiss, those exhibits do not contain Ms. Wu's signature. Ms. Wu is unclear about the legal effect of this document, but

---

[1] As discussed below, this case was filed by Maoni Ye (Ms. Wu's spouse) and Qian Wu. Defendant contends that it is Ms. Wu who has standing to pursue this lawsuit, and Plaintiff does not oppose Mr. Ye's dismissal. The Clerk is directed to reflect this dismissal in the case docket.

asserts that even in the face of the written terms and conditions, she nevertheless plausibly states consumer fraud claims.

Nordic has moved to dismiss the complaint under FED. R. CIV. P. 12(b)(1) [8] and FED. R. CIV. P. 12(b)(6) [9].  For the reasons explained here, Nordic's motion to dismiss for failure to state a claim [9] is granted in part and denied in part.  Wu's claims under the New Jersey Electric Discount and Energy Competition Act ("EDECA"), as well as her claims on behalf of customers outside New Jersey, are dismissed.  Nordic's Rule 12(b)(1) motion to dismiss [8] is denied.

## BACKGROUND

### I.      Factual Background

The facts as alleged in the Complaint [1] are accepted as true at this stage.  *In re Harley-Davidson Aftermarket Parts Mktg., Sales Pracs. & Antitrust Litig.*, 151 F.4th 922, 926 (7th Cir. 2025).

In 1999, the New Jersey Legislature and the New Jersey Board of Public Utilities ("BPU") deregulated New Jersey's market for electricity and natural gas.  New Jersey was one of numerous states that took similar actions, all with the goal of "increas[ing] competition," "achieving greater consumer choice," and accomplishing "an overall reduction of energy rates."  (Compl. [1] ¶ 15.)  In the wake of this deregulation, several independent energy supply companies ("ESCOs") emerged.[2]  Nordic is one such ESCO.  As this court described in *Bickel v. Nordic Energy Servs., LLC*, No. 25 C 3454, 2026 WL 444691, at *1 (N.D. Ill. Feb. 17, 2026) a related case raising similar claims against Nordic brought by some of the same attorneys who represent Wu, an ESCO "buys electricity or natural gas from suppliers on the same market available to utilities, and then sells it

---

[2]      Nordic explains that "'ESCO' refers to a retail energy service company like Nordic. It is an abbreviation used in New Jersey and elsewhere," akin "to the terms 'AGS' (alternative gas supplier) and 'ARES' (alternative retail energy supplier) used in Illinois (and in the *Bickel* case)." (12(b)(1) Mot. [8] at 5 n.1.)  *See Bickel v. Nordic Energy Servs., LLC*, No. 25 C 3454, 2026 WL 444691, at *1 (N.D. Ill. Feb. 17, 2026) (referring to Nordic as an alternative retail energy supplier ["ARES"] and declining to dismiss allegations that Nordic's pricing violated the Indiana Deceptive Consumer Sales Act).

to customers, essentially acting as an energy broker, but with greater flexibility than utilities in choosing how and where to source the energy." *Id.* at *1.

An ESCO has greater options to acquire energy than regulated utilities: ESCOs like Nordic can "purchase wholesale energy using the exact same wholesale market as utilities," but they can also, for example, own energy production facilities, purchase energy from wholesale marketers and brokers, or purchase energy through future contracts "for the delivery of electricity and natural gas in the future at a predetermined price." (Compl. [1] ¶ 22.) According to Wu, "[t]he fundamental purpose of deregulation is to allow ESCO to use these and other innovative purchasing strategies to reduce wholesale energy acquisition costs and pass those savings on to customers." (*Id.*)

### A. Nordic's Solicitation and Agreement

Nordic, an Illinois LLC,[3] is one such ESCO operating across the United States. (*Id.* ¶ 11.) On May 23, 2024, a Nordic telemarketer called Plaintiff Qian Wu to solicit her enrollment for natural gas supply. Wu resides in Bridgewater, New Jersey with her spouse, Maoni Ye. On the call with the Nordic representative, once Wu agreed to switch over her gas supply to Nordic, a "third party agent of Nordic" joined the call. That agent made the following representations:

> Nordic Energy will sell you gas at introductory rate of 38.9 cents per therm for the initial two months followed by a variable rate equal to Nordic Energy's cost to acquire a supply plus 50 cents per therm . . . By agreeing to enroll with Nordic Energy, you will be automatically enrolled on no extra charges at Nordic Green program in which Nordic Energy will procure carbon offsets for 100% of your natural gas usage and includes [sic] renewable energy certificates to offset 100% of your electric usage.

---

[3] After the court noted concerns regarding subject matter jurisdiction in *Bickel* (Case No. 25-cv-3454 [37]), the parties there filed a joint statement confirming subject matter jurisdiction (Case No. 25-cv-3454 [38]), wherein they confirmed that Nordic is a limited liability company and that all of its members are Illinois citizens. The court again directs the parties to file a joint statement in this case confirming facts that support the court's exercise of subject matter jurisdiction.

(Compl. [1] ¶ 30.)[4]  Ms. Wu verbally accepted Nordic's offer.  During the call, the Nordic agent also stated that "Nordic Energy will send you a confirmation letter with a contract summary and your contract terms and conditions which includes the full terms and conditions of the agreement that were summarized on this call."  (*Id.* ¶ 30 n.6.)  Ms. Wu does not recall receiving any of these documents, and the document that Nordic has submitted and claims is the parties' written contract[5] is not signed by Ms. Wu—indeed, there is no line where Ms. Wu or New Jersey customers like her could sign the document agreeing to its terms in the first place.

The document filed by Nordic contains some inconsistent language.  First, the Terms and Conditions document states, in relevant part, that

> [t]he first two (2) months will be billed at an introductory price of $0.389 per therm, and the remaining thirty-four (34) months will be billed at Nordic's cost to acquire your natural gas, plus $.50 cents per therm. Nordic will determine its costs to acquire your natural gas based on many different factors, which include but are not limited to, competitive prices, industry charges incurred in serving your account, applicable taxes, profit margins and other business conditions. All prices are set by Nordic at its sole discretion and may be higher or lower than your utilities' posted rate for supply.  Nordic's price does not include the utilities' charges. Since the variable price is tied to Nordic's costs to acquire the supply, there is no limit on variability of this price from one billing cycle to the next. You will be responsible for paying any new or increased taxes, fees or other charges imposed on you or Nordic in connection with the services provided under this Agreement during its Term upon notice from Nordic as set forth below. At the end of the Term, this Agreement will automatically renew month-to-month on the same variable pricing described above.

---

[4]        Wu states that, before filing this lawsuit, she requested a copy written terms from Nordic.  In response, she received an email from a Nordic customer service email account containing a recording of portions of the May 23, 2024 call, and no written agreement or terms and conditions.  (Compl. [1] ¶ 30 n.6.)  The court assumes that the somewhat awkward quoted language in Wu's complaint is transcribed from this audio recording.

[5]        "[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim."  *Mueller v. Apple Leisure Corp.*, 880 F.3d 890, 895 (7th Cir. 2018) (citation and internal quotation marks omitted). The role of the written terms and conditions that Nordic attached to its motions to dismiss is unclear at this stage.  While Ms. Wu makes reference to the document in her complaint (by alleging that the Nordic representative with whom she spoke told her Nordic would later send her the terms and conditions), the court is not prepared to deem the document "central to [her] claim[s]."  *Id.*  Still, because Ms. Wu references the written contract to rebut Nordic's arguments and make her own, and because she does not object to the court's consideration of the document, the court will reference Nordic's filed document throughout the course of its opinion.

(Terms & Conditions ("T&C") [8-1] at 4.)  The document also contains a "Third Party Supplier Contract Summary" outlining a price structure:

> Fixed for two monthly billing cycles, then variable.  Fixed means the cost of your natural gas supply ($0.389 per therm) stays the same.  Your variable price is based on Nordic's cost to acquire your supply plus $.50 cents per therm.  There are no ranges or ceilings on your price.  Fluctuations in the weather may also cause the price of natural gas to increase.

(*Id*. at 12.)  But in addition to these disclaimers, the document contains a clause that incorporates the recorded third-party phone verification ("TPV"):

> These Terms and Conditions, in addition to the recorded third-party phone verification ("TPV") or online electronic enrollment authorization (as applicable), are your agreement (the "Agreement") for the purchase of natural gas supply and applicable additional services with Nordic.

(*Id*. at 4.)

Ms. Wu continued to purchase natural gas from Nordic until January 2025, at which point she moved to a different natural gas provider.  (Compl. [1] ¶ 10.)

## B.    Ms. Wu is Overcharged

Ms. Wu alleges that rather than passing along savings to customers, Nordic "took advantage of deregulation and the lack of regulatory oversight to charge customers exorbitant rates" (Compl. [1] ¶ 25), specifically by charging customers more than Nordic's cost to acquire the customers' natural gas supply, plus the fixed markup.  To demonstrate this overcharge, Ms. Wu points to "publicly available data regarding the market prices for natural gas in the same market and at the same time as Nordic purchased natural gas" during the period Nordic supplied natural gas to Ms. Wu's home.  (Compl. [1] ¶¶ 33–34.)  For example, she compares Nordic's variable rate with the "city-gate price" in New Jersey, that is, the sales price of natural gas at "the point where natural gas is transferred from an interstate or intrastate pipeline to a local natural gas utility."  (*Id*. ¶ 36.)  Importantly, Ms. Wu alleges that "ESCOs like Nordic can purchase natural gas at these prices, or they can use alternative purchasing strategies to obtain even lower prices."  (*Id*.)  Whether an ESCO might in some instances pay a higher price when it purchases from an

alternative source is not stated, but Wu maintains that the city-gate price is a conservative figure for estimating Nordic's cost of acquiring her natural gas supply. When Ms. Wu's variable rate is compared with the corresponding city-gate price of natural gas, plus 50 cents per therm, then— assuming that the city-gate price is a proper comparator—it appears that Nordic consistently overcharged her by some 12% to 50% during the duration of Nordic's term as her natural gas supplier. (Compl. [1] ¶ 35.)

Ms. Wu also compares Nordic's variable rate to the rates charged by New Jersey's local utility, Public Service Electric and Gas Company ("PSE&G"). Assuming that PSE&G's rates are proper comparators, Nordic consistently overcharged Ms. Wu by anywhere between 35 and 89% when contrasting Nordic's variable rate against PSE&G's gas supply price plus 50 cents per therm. (Compl. [1] ¶ 42.)

Ms. Wu also alleges that Nordic consistently increased its variable rates by 10 to 13 cents each month, resulting in a 40% increase over the course of the time that Nordic supplied natural gas to her home. (*Id.* ¶ 37.) This gradual but consistent pricing increase is a practice that Ms. Wu calls "glidepath pricing," meaning that because "customers are more likely to notice sudden large increases in their bills rather than a bill that steadily increases," Nordic placed its customers on a "glide path to higher rates." (Compl. [1] ¶ 38.) Nordic's promise to procure carbon offsets for 100% of her natural gas usage cannot explain this discrepancy, Ms. Wu asserts, because the costs to purchase carbon offsets for 100% of Ms. Wu's usage ranged from just 10 to 13 cents per therm. (Compl. [1] ¶ 45.)

## II.    Procedural History

Based on these allegations, Ms. Wu brings claims for violations of the New Jersey Consumer Fraud Act, as well as the EDECA and Retail Choice Consumer Protection Regulations, on behalf of herself and all "New Jersey residential and commercial customers to whom Nordic

promised to charge a variable rate based on, equal to, or reflective of Nordic's cost to acquire or procure the natural gas or electricity supply it will sell them, plus an adder."[6]  (Compl. [1] ¶ 52.)

Ms. Wu also alleges that Nordic makes the same promise to charge "a variable rate based on, equal to, or reflective of Nordic's cost to acquire or procure the natural gas or electricity supply it will sell them, plus an adder" across the country in promoting its natural gas and electricity supply.  (*Id.* ¶ 51.)  Accordingly, she brings claims "on behalf of a class of all residential and commercial customers in the United States to whom Nordic" made this promise.  (*Id.*)  These are claims for violations of "materially identical" consumer protection statutes in Delaware, the District of Columbia, Indiana, Illinois, Maryland, Massachusetts, Michigan, New York, Ohio, Pennsylvania, Rhode Island, and Virginia.  (*Id.* ¶¶ 81, 111–112.)  Ms. Wu has not, however, made any allegations that Nordic overcharged customers in states outside of New Jersey.[7]

Nordic has moved to dismiss Ms. Wu's claims under FED. R. CIV. P. 12(b)(1) and 12(b)(6) in two separate motions [8] and [9].  Ms. Wu filed briefs in opposition [19], [20], as well as a notice of supplemental authority [21] referencing *Youngs v. DraftKings Inc.*, No. 25-00179 (D.N.J.).  Nordic replied [22] and [23], and both sides filed additional briefs [27], [28].  The motions are now fully briefed.

## **LEGAL STANDARD**

A motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction.  "[S]ubject matter jurisdiction is a fundamental limitation on the power of a federal court to act."  *Del Vecchio v. Conseco, Inc.*, 230 F.3d 974, 980 (7th Cir. 2000).  If a federal court "determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action."  FED. R. CIV. P. 12(h)(3).  As the party invoking federal jurisdiction, Ms. Wu bears the burden of demonstrating

---

[6]  The parties use the term "adder" to refer to Nordic's fixed 50-cent-per-therm markup.

[7]  Ms. Wu also brought claims of unjust enrichment on behalf of herself and her proposed New Jersey and National classes in her original complaint, but she does not oppose dismissal of those claims.  (12(b)(6) Opp'n [20] at 19 n.12.)  They are dismissed without prejudice.

7

jurisdiction by a preponderance of the evidence. *See Collier v. SP Plus Corp.*, 889 F.3d 894, 896 (7th Cir. 2018).

Similarly, a motion to dismiss under Rule 12(b)(6) challenges the sufficiency of the complaint, not its merits. FED. R. CIV. P. 12(b)(6); *Hallinan v. Fraternal Ord. of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive, a complaint must "'state a claim to relief that is plausible on its face.'" *Emerson v. Dart*, 109 F.4th 936, 941 (7th Cir. 2024) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is considered plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[D]etailed factual allegations" are not required, but "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555.

## DISCUSSION

### I.      Choice of Law

The parties disagree about whether the court should apply New Jersey or Illinois law to Ms. Wu's claims. Nordic argues that, because the written terms and conditions contain a choice of law provision specifying that the "Agreement shall be governed by, construed and enforced in accordance with the laws of the State of Illinois without regard to conflict of law principles," Illinois law governs. (12(b)(6) Mot. [9] at 5 n.5 (quoting T&C [8-1] at 7).) Ms. Wu asserts that because she "do[es] not seek enforcement of the Contract," the choice of law provision in the agreement does not apply. Instead, she argues that because "Plaintiffs are New Jersey residents who heard Defendant's misrepresentation and received energy supply in New Jersey," New Jersey law governs. (12(b)(6) Opp'n [20] at 7 n.1.)

This claim arises out of the court's diversity jurisdiction, so the court looks to the "conflict-of-laws rules of the forum state," Illinois, to determine which state's "applicable substantive law" will apply in this case. *Jupiter Aluminum Corp. v. Home Ins. Co.*, 225 F.3d 868, 873 (7th Cir. 2000). "Illinois applies contractual choice of law provisions unless they are contrary to Illinois

8

public policy." *Sutter Ins. Co. v. Applied Sys., Inc.*, No. 02 C 5849, 2004 WL 161508, at *7 (N.D. Ill. Jan. 26, 2004). It is unclear whether Nordic's attached terms and conditions are binding on the parties. In any case, "a choice of law provision will not be construed to govern tort as well as contract disputes unless it is clear that this is what the parties intended." *CERAbio LLC v. Wright Med. Tech., Inc.*, 410 F.3d 981, 987 (7th Cir. 2005) (citing *Kuehn v. Children's Hosp., Los Angeles*, 119 F.3d 1296, 1302 (7th Cir. 1997)). Even if the terms and conditions document (which Ms. Wu does not recall receiving and which was not signed by her) constitute a binding agreement, the plain language of the choice of law provision does not clearly extend to tort claims like the ones raised by Ms. Wu, which relate to Nordic's allegedly deceptive business practices. These claims fall outside the realm of contract issues such as the scope of enforcement and construction of the agreement. Thus, assuming the terms and conditions bind the parties, the choice of law provision still does not govern this lawsuit.

For cases not governed by choice-of-law provisions, "Illinois follows the Restatement (Second) of Conflicts of Laws and uses the 'most significant relationship' test to decide choice-of-law issues." *Siegel v. Shell Oil Co.*, 256 F.R.D. 580, 585 (N.D. Ill. 2008), *aff'd*, 612 F.3d 932 (7th Cir. 2010) (citing *Carris v. Marriott Int'l, Inc.*, 466 F.3d 558, 560 (7th Cir. 2006)). In the consumer protection context, "where a plaintiff relies on a representation in the same state where that representation was made and received, the law of that state applies." *Id.* (citing Restatement (Second) of Conflicts of Laws § 148(1) (1971)). Ms. Wu both received and relied on the representation at issue in New Jersey. Thus, the court applies New Jersey substantive law in deciding Ms. Wu's state law claims.

## II.     Rule 12(b)(1) Motion

Nordic argues that Ms. Wu lacks standing to bring a claim on behalf of herself and on behalf of her proposed national class and New Jersey-based subclass. In Nordic's view, Ms. Wu's "written Contract proves she was not promised a formulaic 'variable rate based on [Nordic's] cost to acquire energy supply plus the specified adder' as all the claims in the complaint assume."

(12(b)(1) Mot. [8] at 2.)  This merits-based argument misunderstands Wu's burden at this stage. Wu need not "show that [she] will win in order to establish standing." *Pit Row, Inc. v. Costco Wholesale Corp.*, 101 F.4th 493, 501 (7th Cir. 2024); *Krasno v. Mnookin*, 148 F.4th 465, 477 (7th Cir. 2025) ("Standing does not require a plaintiff to prove success on the merits.  Rather, it requires demonstrating a colorable claim to a right the defendant allegedly infringed" (citation and emphasis omitted)).  For now, all she needs to do is plausibly allege a concrete injury, caused by Nordic, that is redressable by court action.  *In re Recalled Abbott Infant Formula Prods. Liab. Litig.*, 97 F.4th 525, 528 (7th Cir. 2024).  Nordic contends the written terms and conditions defeat Ms. Wu's claims.  Resolving the standing issue on this basis would require the court to dive into the merits of Ms. Wu's claims, and the court will not resolve standing on that basis.

Nordic does not contend that Ms. Wu has not suffered a concrete injury, that her alleged injury did not stem from Nordic's conduct, or that the court would not be able to redress this injury, the bases upon which a defendant generally challenges a plaintiff's standing.  The court is satisfied that Ms. Wu has sufficiently demonstrated that she has "a personal stake in the matter" at issue.  *Krasno*, 148 F.4th at 476 (citation and internal quotation marks omitted).  Specifically, Ms. Wu alleges that she has suffered monetary injury resulting from Nordic's alleged misrepresentations that the variable rate would be based on Nordic's cost to acquire gas with a fixed 50 cent markup, and from Nordic's monthly overcharges in her residential gas bill.  These allegations are sufficient to establish the elements of standing.  *See In re Aqua Dots Prods. Liab. Litig.*, 654 F.3d 748, 751 (7th Cir. 2011) ("The plaintiffs' loss is financial: they paid more for the [challenged good] than they would have . . . A financial injury creates standing.").

Nordic also challenges Ms. Wu's standing to raise class claims because she argues that while other Nordic customers (like Bickel) were promised "a formulaic 'variable rate based on, equal to, or reflective of Nordic's cost to acquire or procure [energy], plus an adder," Wu's terms and conditions promised a variable rate set in Nordic's sole discretion based on a nonexclusive list of "many different factors."  (12(b)(1) Mot. [8] at 2.)  But in so arguing, Nordic conveniently

10

overlooks its other alleged representations in which Nordic does explicitly promise she would be charged a variable rate based on Nordic's cost of acquiring natural gas, plus the fixed markup.  In any case, Nordic's argument regarding standing invites the court, again, to resolve this threshold jurisdictional question on the merits.  The court declines that invitation.

As explained below, the court will dismiss nationwide class claims on other grounds, but Nordic's 12(b)(1) motion is denied.

## III.     Rule 12(b)(6) Motion

### A.      New Jersey Consumer Fraud Act Claim

Plaintiff alleges that Nordic violated the New Jersey Consumer Fraud Act ("CFA"), N.J. Rev. Stat. § 56:8-2, by knowingly omitting material rate-setting facts in its communications with Ms. Wu.  To state a CFA claim, a plaintiff must allege: "(1) unlawful conduct; (2) an ascertainable loss; and (3) a causal relationship between the unlawful conduct and the ascertainable loss." *Antar v. BetMGM, LLC*, No. 24-1364, 2025 WL 1219316, at *2 (3d Cir. Apr. 28, 2025) (citation omitted).  "Unlawful conduct covers three types of practices: 'affirmative acts, knowing omissions, and regulation violations.'"  *Id.* (citing *Cox v. Sears Roebuck & Co.*, 647 A.2d 454, 462 (N.J. 1994)).  The test for unlawful conduct "is whether the conduct of a defendant has the capacity to mislead the average consumer."  *N.Y. Career Guidance Servs., Inc. v. Wells Fargo Fin. Leasing, Inc.*, No. BER-L-1705-03, 2005 WL 1252315, at *5 (N.J. Super. Ct. Law Div. May 2, 2005) (collecting cases).  CFA claims must be evaluated against a background that "[i]n enacting the CFA, the New Jersey Legislature intended to give New Jersey one of the strongest consumer protection laws in the nation.  Therefore, its history is one of constant expansion of consumer protection, and it should be construed liberally in favor of consumers."  *Alpizar-Fallas v. Favero*, 908 F.3d 910, 915 (3d Cir. 2018) (citations and internal quotation marks omitted).

Ms. Wu alleges that Nordic unlawfully misrepresented and omitted key facts regarding its rate setting formula by representing—both in its solicitation call, and in its Contract Summary [8-1]—that variable rates would be set based on Nordic's cost to acquire natural gas plus the fixed

11

mark-up, but then charged variable rates that were not actually tied to this formula. (12(b)(6) Opp'n [20] at 9–10.) She also alleges that Nordic's violations of the regulations promulgated under EDECA provide further support to her CFA claims. Nordic argues that Ms. Wu has failed to state a claim in the face of what Nordic deems a written agreement, and that her factual allegations are not sufficient to demonstrate Nordic overcharged her. As explained below, the court rejects both arguments.

### 1.    Contract-Based Challenges

Nordic argues that Ms. Wu's CFA claim necessarily fails because "Plaintiffs have not alleged (and cannot allege) that Nordic breached the terms of the Contract." (12(b)(6) Mot. [9] at 10.) Second, Nordic argues that where a contract does exist, a plaintiff must allege a breach of contract and a "substantial aggravating circumstance, demonstrating that the defendant's behavior stands outside the norm of reasonable business practice in that it will victimize the average consumer," and Ms. Wu has failed to do so. *Marshall v. Verde Energy USA, Inc.* ("*Marshall I*"), No. CV 18-1344 (JMV) (JBC), 2019 WL 1254562, at *3 (D.N.J. Mar. 19, 2019) (cleaned up).

As noted, the court is uncertain that Nordic's Terms and Conditions document may be characterized as an agreement. For her part, without explicitly conceding that a contract exists, Ms. Wu argues that the document Nordic relies on does not bar her CFA claims because she does not allege a breach of contract, and "contract disclaimers do not shield sellers from liability stemming from their deceptive misrepresentations and omissions." (12(b)(6) Opp'n [20] at 14.) In her notice of supplemental authority, Wu argues that Nordic's "contract-as-inoculation" defense is foreclosed by *Youngs v. DraftKings Inc.*, No. 25-00179 (SRC), 2025 WL 3226988, at *7 (D.N.J. Nov. 19, 2025), where the court held that "concealing the terms of a promotion under a bold heading and having fine print terms which are unascertainable or too small to realistically read may constitute illegal and deceptive conduct, even if the terms were at some point fully provided and clearly spelled out." (Notice of Supp. Authority [21] at 1; 12(b)(6) Opp'n [20] at 15.) The

12

*Youngs* court concluded that the defendant's marketing of a betting promotion as "Risk-Free" could constitute consumer fraud where the fine print disclosed that consumers would receive a "Bonus Bet"—" essentially a coupon to place another [] wager on the DraftKings app" which had "no cash value, [is] non-transferrable, ha[s] an expiration date, and cannot be withdrawn"—in place of a cash refund. 2025 WL 3226988, at *1, 8. The court agrees with Ms. Wu. As in *Youngs,* the written terms and conditions do not bar her CFA claims where those terms and conditions were overshadowed by defendant's misrepresentations and omissions.

Ms. Wu further argues that even assuming the terms and conditions constituted a valid agreement between the parties, she has sufficiently stated a claim. Again, the court agrees. In asking the court to dismiss Plaintiff's complaint, Nordic cites to *Marshall I,* in which the federal court in New Jersey considered CFA claims raised against another ESCO, Verde Energy, USA. The plaintiff in that case alleged that the defendant engaged in wrongful conduct by charging consumers significantly more than the wholesale rate for natural gas and the price charged by PSE&G, though in its Welcome Letter, Verde announced that it "looked forward to saving you money on your monthly electric bills in the months to come." 2019 WL 1254562, at *1. Those allegations were not, in the court's view, sufficient to state a CFA claim in light of language in the "Terms of Service," stating that the customer agrees and understands "that the rate may fluctuate with market conditions." *Id*. (emphasis omitted). And the court found no aggravating circumstance based on what the plaintiff had alleged were misrepresentations made by Verde's Welcome Letter because Verde's communications constituted "general conclusory statements," or "puffery," and were therefore not actionable under the CFA in light of the contract's express terms. *Id.* at *4.

But in reaching this conclusion, the *Marshall I* court distinguished the facts in the case before it from the facts in *Melville v. Spark Energy*, No. 15-8706, 2016 WL 6775635 (D.N.J. Nov. 15, 2016), a case against yet another ESCO. The *Melville* court had denied a motion to dismiss a CFA claim because the "defendant ESCO's 'representations that customers will pay less in

13

comparison to their local energy supplier and average out over time'" as well as a promise by the ESCO's sales representative that the customer would "save a minimum of ten percent on his energy bills" were "specific enough and not puffery" to state a colorable CFA claim. *Marshall I,* 2019 WL 1254562, at *4 (quoting *Melville*, 2016 WL 6775635, at *4). Despite the valid contract between the parties, the *Melville* court concluded that the defendant ESCO's misrepresentations presented aggravating circumstances that were sufficient to permit Melville's claims to move forward. The court reasoned that "even when extrinsic evidence directly conflicts with a complete and integrated contract, a misrepresentation may be actionable under the [CFA] if a contracting party, presented with a written contract by the other party, justifiably relies on the misrepresentation."[8] *Melville*, 2016 WL 6775635, at *4 (citing *Kalathia v. PMM, Inc.*, 2010 WL 4156769, at *2–3 (N.J. Super. Ct. App. Div. Oct. 25, 2010)). It was the distinction recognized in *Melville* between mere puffery and actionable misrepresentations that led the *Marshall I* court to conclude that Verde Energy's statements were not actionable.

In this case, Nordic's representations go beyond mere puffery and make specific promises. Nordic made oral and written representations that the variable rate would be based on its cost to acquire natural gas, without reference to the discretion it retained to increase those rates based on a variety of factors. Those representations are sufficiently specific to support reliance on the part of a reasonable consumer. A promise to set variable rates by referencing a specific price point—Nordic's actual incurred costs in the procurement of natural gas—is materially different from a vague statement by an ESCO in its Welcome Letter that the ESCO "look[s] forward to saving you money on your monthly electric bills in the months to come." *Marshall I*, 2019 WL 1254562, at *1.

---

[8] The *Melville* court ruling was a response to ESCO defendant's argument that the Parol Evidence Rule barred the court from considering the statements made by its sales representative. Nordic has not made such an argument in this case, but the *Melville* court's reasoning is nevertheless relevant to the broader question of whether a CFA claim may rest on representations that conflict with a contract's written terms.

Notably, the *Marshall I* court dismissed plaintiff's complaint without prejudice but granted leave to file an amended complaint, and plaintiff did so. That amended complaint survived a motion to dismiss. The court concluded that plaintiff pleaded a plausible claim under the CFA by alleging that defendant had failed to comply with the State of New Jersey's Electric Discount and Energy Competition Act regulations, and thus had "act[ed] outside the norm of reasonable business practices." *Marshall v. Verde Energy USA, Inc.* (*"Marshall II"*), No. CV181344JMVJBC, 2020 WL 5905072, at *8 (D.N.J. Oct. 5, 2020). Ms. Wu similarly alleges here that Nordic violated applicable EDECA regulations. As the court explains below, there is no private right of action under EDECA, but as in *Marshall II*, allegations that Nordic violated N.J. ADMIN. CODE § 14:4-7.3(d)(1) and § 14:4-7.4(n)(1) can support Plaintiff's CFA claim. Section 14:4-7.3(d)(1) provides that "[i]n the advertisement of their services [ESCOs and their agents] are prohibited from . . . [m]aking false or misleading advertising claims to a potential residential customer," and § 14:4-7.4(n)(1) imposes an identical prohibition for marketing claims. Nordic's agent represented that Ms. Wu's variable rate would be "equal to Nordic Energy's cost to acquire a supply plus 50 cents per therm," without reference to the discretionary factors outlined in Nordic's full terms and conditions. Ms. Wu contends that a reasonable consumer would understand this to mean Nordic's variable rate would be tied to its cost in acquiring natural gas supply, without hidden markups. In light of the unexplained overcharge alleged in Plaintiffs' complaint, these marketing and/or advertising claims were misleading and would therefore constitute violations of the EDECA regulations. The alleged regulatory violations provide independently sufficient aggravating circumstances to support Ms. Wu's CFA claim, regardless of the language in the written agreement presented by Nordic.

### 2.      Challenges to Factual Sufficiency

Nordic argues separately that even if the court were to determine that Nordic lacked discretion to set the variable rate, Ms. Wu has not provided sufficient factual allegations to show she was overcharged.

15

In support of this assertion, Nordic argues, first, that Ms. Wu relies on comparators that are improper as a matter of law, therefore rendering her allegations insufficient to prove she was overcharged. Nordic notes that in *Sevugan v. Direct Energy Servs., LLC*, 931 F.3d 610 (7th Cir. 2019), the Seventh Circuit affirmed dismissal of a consumer-plaintiff's complaint alleging that an alternative energy supplier breached its contract by overcharging consumers on the ground that neither a "wholesale price" nor a utility rate is a "market price at all," and therefore, neither is a "proper comparator" for "the "generally prevailing market price" of a commodity. *Sevugan*, 931 F.3d at 615–17. Nordic contends that Ms. Wu's comparison of the price she is charged to the wholesale or city-gate price is similarly flawed. But the language in Nordic's solicitation call and contract summary is materially different from what was at issue in *Sevugan*. The *Sevugan* contract promised that the variable rate it charged would be based on "generally prevailing market prices for electricity"; Nordic promised more specifically to set rates based on its "cost to acquire" natural gas. In *Sevugan*, the wholesale price was not a proper basis for determining that the consumer—who was promised a rate based on "generally prevailing *market* price"—had been overcharged, because "[i]ndividual customers like Sevugan could not go out and purchase electricity at the [wholesale] rate." *Id.* at 615 (emphasis supplied). The wholesale or city-gate price does, however, have relevance where, as in this case, Nordic's representation expressly ties variable rates to the *provider's* own cost to acquire gas supply. Ms. Wu alleges that Nordic could have acquired its natural gas supply at that wholesale or city-gate price per therm, and Nordic has not argued otherwise. The court agrees, as it did in *Bickel*, that the utility price is a "comparison of apples to oranges, as regulated utilities do not 'participate in the general market for electricity.'" 2026 WL 444691, at *6 (quoting *Sevugan*, 931 F.3d at 616). But by reference to the city gate or wholesale price, Ms. Wu has sufficiently alleged that Nordic consistently overcharged her by up to 50%. These factual allegations are sufficient to support a claim.

Second, Nordic argues that Ms. Wu's alleged overcharges are improper as a matter of fact because the average overcharge over the course of Ms. Wu's term of service was, in Nordic's

view, insignificant. Nordic points out that the majority of the overcharge factors listed in the complaint are 1.3 or lower, translating to an overcharge of between 12 and 30%. (12(b)(6) Mot. [9] at 8–9.) The court rejects this argument for the same reason it rejected it in *Bickel*: "The existence of the mechanism of a class action—often the only way to pursue recovery for class members whose individual harm may be *de minimis*—demonstrates that even a small overcharge can support a claim." 2026 WL 444691, at *6.

Third, Nordic contends that customers were not overcharged because Nordic also agreed to "procure and retire carbon offsets for 100% of [Ms. Wu's] natural gas usage," which would justify the alleged overcharge. Still, Ms. Wu alleges that, at most, these offsets would cost 10 to 13 cents per therm, and would not account for the full overcharge factor for the majority of Ms. Wu's term of service with Nordic. She alleges, further, that the Nordic representative assured her on the phone that these carbon offsets would be procured on customers' behalf at no additional charge. (Compl. [1] ¶ 30.) These allegations are presumed true at this stage, meaning that the cost of carbon offsets cannot be used to justify the otherwise unexplained overcharge at the pleading stage.

### B.    New Jersey EDECA Violations

Ms. Wu also raises independent claims alleging violations of the New Jersey Electric Discount and Energy Competition Act ("EDECA") and its accompanying regulations. Nordic challenges these claims on the basis that neither the statute nor the regulations give rise to a private right of action for individuals. In response, Ms. Wu points to the *Marshall II* court's determination that the regulations Ms. Wu claims Nordic violated provide for an "express private right of action." (12(b)(6) Opp'n [20] at 17, 18 n.10 (citing *Marshall II*, 2020 WL 5905072, at *5).) Nordic contends the *Marshall II* court's statement on this issue was dicta. (12(b)(6) Mot. [9] at 13.) For reasons explained here, this court concludes that neither EDECA nor its accompanying regulations can be read to confer a private right of action—express or implied—to individuals harmed by alleged violations of these provisions.

17

As a matter of first principles, New Jersey law does not recognize private causes of action arising from regulatory, as opposed to statutory, text where the legislature has not clearly conferred to the agency the power to authorize a private cause of action against another private party. *Turner v. Johnson*, No. CV17541PGSTJB, 2020 WL 6323698, at *3 (D.N.J. Oct. 28, 2020) ("[T]he breach of administrative regulations does not of itself give rise to a private cause of action." (quoting *Ferraro v. City of Long Branch*, 714 A.2d 945, 955 (N.J. Super. Ct. App. Div. 1998))); *In re New Jersey Mar. Pilot & Docking Pilot Commission's Determination Regarding Examination Requirement for Licensure of New Jersey Docking Pilots*, 443 N.J. Super. 325, 335, 128 A.3d 1120, 1126 (App. Div. 2015) ("An administrative agency may not give itself authority not legislatively delegated." (internal quotation marks omitted)); *see also In re Riverview Dev., LLC*, 411 N.J. Super. 409, 436, 986 A.2d 714, 730 (App. Div. 2010) ("Absent a statutory provision that expressly confers a right to a hearing, an administrative agency cannot create such a right by mere regulation, because doing so would violate the Legislature's clear prohibition within the [New Jersey Administrative Procedure Act].") Ms. Wu has not cited anything in EDECA that confers an express private right of action to sue for violations of the accompanying regulations. In a footnote, she argues that EDECA "makes clear that it affords both administrative and judicial relief." (12(b)(6) Opp'n [20] at 18 n.11 (quoting N.J. REV. STAT. § 48:3-84(b)).) But the judicial remedies referenced in the statute refer only to the ones "provided in this act," and Ms. Wu fails to cite any provision that clearly affords to private individuals a right to sue. *Cf.* N.J. REV. STAT. § 56:8-19 (clearly conferring a private right of action in the CFA's statutory text: "Any person who suffers any ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person of any method, act, or practice declared unlawful under this act or the act hereby amended and supplemented may bring an action or assert a counterclaim therefor in any court of competent jurisdiction.")

The court recognizes that "a statute that does not expressly create a private cause of action may, nonetheless, implicitly create one." *Jarrell v. Kaul*, 223 N.J. 294, 307, 123 A.3d 1022,

1029 (2015). To determine the existence of an implied cause of action, New Jersey courts employ a three-prong test that inquires

> [1] whether the plaintiff is one of the class for whose especial benefit the statute was enacted; [2] whether there is any evidence that the Legislature intended to create a private cause of action under the statute; and [3] whether implication of a private cause of action in this case would be consistent with the underlying purposes of the legislative scheme.

*Id.* (citation, emphasis, and internal quotation marks omitted). New Jersey courts apply this test "against a general background reluctance to imply a private right of action," and that reluctance is compounded here by federal courts' avoidance in "expanding state-law liability in ways not foreshadowed by state-court precedent." *MHA, LLC v. Amerigroup Corp.*, 539 F. Supp. 3d 349, 354–55 (D.N.J. 2021); *Beye v. Horizon Blue Cross Blue Shield of New Jersey*, 568 F. Supp. 2d 556, 571–72 (D.N.J. 2008) ("This inquiry is a delicate one that raises serious issues of comity and federalism . . . [F]ederal courts have become increasingly reluctant to imply causes of action in federal laws . . . Federalism and comity dictate that federal courts should be even less inclined to increase state-law liability by finding such implied rights in state laws." (internal quotations and citations omitted)).

Under New Jersey's three-pronged test for determining an implied right of action, the first factor weighs in favor of Ms. Wu, one of those for whom the legislation was enacted. Through EDECA, the New Jersey legislature "finds and declares that it is the policy of this State to: Lower the current high cost of energy, and improve the quality and choices of service, for all of this State's residential, business and institutional consumers,"—language drafted with consumers like Ms. Wu in mind. N.J. REV. STAT. § 48:3-50.

The remaining factors are less favorable to her argument. Ms. Wu has not identified any language in EDECA that implies the legislature's intent to create a private right of action. She cites only to the language in EDECA's accompanying regulations, which provide that ESCOs that violate the regulations "[s]hall be liable to the residential customer . . . in accordance with any procedures as the [New Jersey BPU] may prescribe." N.J. ADMIN. CODE § 14:4-7.13. Agency

19

intent is not legislative intent.[9]  And even if regulatory text on its own could confer a private right of action, the text in § 14:4-7.13 suggests that the mechanism contemplated for enforcement is an administrative apparatus that the BPU could, at some point, choose to develop; it does not provide that customers can impose liability on ESCOs for regulatory violations in court.[10]

The third factor also weighs against Ms. Wu's argument.  The language of EDECA is geared towards guiding the New Jersey Board of Public Utilities in its enforcement of the statute. *See, e.g.*, N.J. REV. STAT. §§ 48:3-80–48:3-82 (outlining investigative, disciplinary, and alternative disciplinary powers of the board); *see also Steinberg v. Sahara Sam's Oasis, LLC*, 226 N.J. 344, 360–61, 142 A.3d 742, 752 (2016)  (holding that the N.J. Safety Act differs from the CFA because the Safety Act "implements an administrative and regulatory scheme enforced by the executive branch; it does not give rise to a private cause of action or a tort-liability scheme").

Ms. Wu's claims under EDECA and its accompanying regulations are dismissed.

### C.  Claims for Proposed Nationwide Class

Nordic argues that Wu has failed to state a claim under various states' consumer protection laws on behalf of consumers outside of New Jersey because she fails to "allege statutory deception claims with any particularity" (12(b)(6) Mot. [9] at 15–16.)  The court agrees for the same reasons it outlined in *Bickel*.  On behalf of consumers in other states, Wu, like Bickel, makes claims supported only by conclusory allegations.  *Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  Ms. Wu has provided a sufficient basis for her allegation

---

[9]  The court recognizes that at least one federal court has applied New Jersey's test for determining the existence of an implied cause of action to *regulatory* text.  *See MHA, LLC v. Amerigroup Corp.*, 539 F. Supp. 3d 349, 355 (D.N.J. 2021).  But it is not clear that this analysis is supported by the language of the test outlined by the New Jersey Supreme Court, which focuses its inquiry on *legislative* intent.  In any case, even the regulatory text here could not be read to supply an implied private cause of action.

[10]  The parties have not alleged that such an administrative scheme currently exists.

20

that Nordic overcharged customers in New Jersey via detailed comparisons of Nordic's variable rate against other utilities and wholesale prices. (Compl. [1] ¶¶ 41, 52.) But she has not presented a sufficient basis for a claim that Nordic also overcharged customers in other states. Those claims are dismissed without prejudice.[11]

## CONCLUSION

Nordic's 12(b)(1) Motion [8] is denied. Nordic's 12(b)(6) Motion [9] is granted as to the EDECA claims and claims brought by Ms. Wu on behalf of Nordic customers in other states. As to Ms. Wu's claims under the New Jersey Consumer Fraud Act, the motion is denied, and Defendant Nordic is directed to file its answer to those allegations within 21 days. The parties are additionally directed to file a joint statement confirming subject matter jurisdiction within 14 days.

ENTER:

Dated: June 10, 2026

REBECCA R. PALLMEYER
United States District Judge

---

[11] It is worth noting that Wu would also have a hard time establishing the requisite similarity to class members outside of New Jersey where—as is demonstrated by the factual distinctions between Bickel's allegations and her allegations—the language in Nordic's terms and conditions and the circumstances surrounding customers' agreements to switch to Nordic as their natural gas or energy supplier varies broadly between states.

21